UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KENNETH CRAWFORD,

                       Plaintiff,

v.

HEIDI WASHINGTON,
MICHIGAN DEPARTMENT
OF CORRECTIONS, CRAIG
HUTCHINSON, QUALITY
CORRECTIONAL CARE OF
MICHIGAN and MICHIGAN
CORRECTIONS COMMISSION,

                       Defendants.

_____/

Case No. 4:17-cv-11423
District Judge Linda V. Parker
Magistrate Judge Anthony P. Patti

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS QUALITY CORRECTIONAL CARE OF MICHIGAN AND CRAIG HUTCHINSON, M.D.'S MOTION FOR SUMMARY JUDGMENT (DE 33) and DISMISS PLAINTIFF'S CLAIMS AGAINST DEFENDANT MICHIGAN CORRECTIONS COMMISSION

**I.     RECOMMENDATION**:  The Court should **GRANT** Defendant Quality Correctional Care of Michigan and Craig Hutchinson, M.D.'s motion for summary judgment (DE 33) and **DISMISS** Plaintiff's claims against them.  In addition, the Court should **DISMISS** Plaintiff's claims against Defendant Michigan Corrections Commission, pursuant to 28 U.S.C.A. § 1915A(b)(1).  Acceptance of these recommendations would close the case.

**II.    REPORT:**

### A.   Plaintiff's Complaint Names Five Defendants, Two of Whom Have Been Dismissed.

Kenneth Crawford is currently incarcerated at the Michigan Department of Corrections (MDOC) Muskegon Correctional Facility (MCF).  (DE 10.)  On April 28, 2017, while incarcerated at the MDOC's Saginaw Correctional Facility (SRF), Plaintiff filed the instant, verified civil rights complaint *in pro per* against five named defendants:  **(1)** the MDOC, **(2)** MDOC Director Heidi Washington, **(3)** Craig Hutchinson, M.D., **(4)** Quality Correctional Care of Michigan (QCCM), and **(5)** the Michigan Corrections Commission (MCC).  (DE 1 at 1-2.)  Plaintiff sues Defendants in their personal and/or official capacities, and he seeks both compensatory and punitive damages.  (DE 1 at 1-2, 12.)  His complaint is signed under penalty of perjury.  (DE 1 at 5.)[1]

Judge Parker has referred this case to me for pretrial matters.  On February 7, 2018, she entered an opinion and order (1) rejecting Plaintiff's objections to my report and recommendation; (2) adopting the report and recommendation; and (3) granting the motion to dismiss and/or for summary judgment filed by Defendants

---

[1] Although Plaintiff originally proceeded *in forma pauperis* (DEs 2, 6), the filing fee has since been paid in full (DE 45).

Washington and the MDOC.  (DE 37.)[2]  Thus, the only remaining Defendants are QCCM, Hutchinson and the MCC.

### B.   Defendants QCCM and Hutchinson's dispositive motion

Defendants QCCM and Craig Hutchinson appeared via counsel on August 14, 2017.  (DEs 15-18, 20.)  On December 29, 2017, they filed a timely motion for summary judgment, along with relevant medical records, which were filed under seal.  (DEs 33-35; *see also* DE 31.)  Plaintiff filed a timely response, and QCCM and Hutchinson filed a reply.  (DEs 36, 38, 39.)

### 1.   The factual allegations span the period from 2005 through May 2016.

The alleged facts underlying Plaintiff's complaint begin in 2005, when "the MDOC medical provider was aware of his HCV [hepatitis C virus] infection . . . [,]" but "simply withheld the information."  Plaintiff claims he was informed that he had chronic HCV in 2010, "as a result of a test for diabetes[,]" but "the progression of the disease was undetermined."  (DE 1 at 6.)

According to Plaintiff, a 2011 liver biopsy "significantly misrepresented" Plaintiff's disease as having progressed to "Stage 2 of 4."[3]  A subsequently test

---

[2] Plaintiff filed a notice of appeal (DEs 41, 42); however, on March 22, 2018, the Sixth Circuit entered an order dismissing the appeal (DE 43).

[3] As explained in another case in which Defendant Hutchinson was a Defendant: "The extent of liver damage experienced by HCV patients is measured using the five-stage Metavir scoring system where 0 represents no fibrosis and 4 represents cirrhosis.  Because complications from HCV most often occur in patients

later that year revealed that he was "already suffering from cirrhosis of the liver . . . [,]" and his correct diagnosis was "Stage 4 of 4."[4]  In 2011, both MDOC protocol and the Centers for Disease Control (CDC) standard of care set "the proper treatment for Stage 4 patients" as "a course of interferon, ribavirin and boceprevir or Tel[e]previr."  Plaintiff alleges that he was denied this treatment, due to, as the treating physician explained, "the selective process of the MDOC protocol . . . ."  Instead, Plaintiff claims that the MDOC placed him on "a regimen of monitoring for signs of liver disease progression . . . [,]" as if he "had not already achieved the penultimate stage, deferring only to death."  Then, during June 2013, Hutchinson "again declined to administer the then current standard of treatment . . . [,]" and stated that Plaintiff "'is best served awaiting treatment in the next six (6) to 12 months.'"  (DE 1 at 6.)

---

experiencing cirrhosis, patients experiencing advanced fibrosis are given higher priority for treatment.  A patient's degree of liver fibrosis can be estimated from the results of laboratory and blood tests.  If active treatment for HCV is indicated, such is often accomplished through use of direct-acting antiviral medications (DAAs)." *Jones v. Smith*, No. 1:15-CV-1308, 2017 WL 4326096, at *3 (W.D. Mich. July 26, 2017) (internal record citations omitted), *report and recommendation adopted*, No. 1:15-CV-1308, 2017 WL 4329725 (W.D. Mich. Sept. 26, 2017) (opinion and order granting motion for summary judgment).

[4] Cirrhosis is "[a] chronic liver disease of highly various etiology characterized by inflammation, degeneration, and regeneration in differing proportions; pathologic hallmark is formation of microscopic or macroscopic nodules separated by bands of fibrous tissue; impairment of hepatocellular function and obstruction to portal circulation often lead to jaundice, ascites, and hepatic failure."  Stedman's Medical Dictionary 178200.

Plaintiff further contends that, in April 2014, Hutchinson admitted that the MDOC "had begun to utilize the newly sanctioned direct acting anti-viral agents (DAA) . . . ."  Still, according to Plaintiff, "MDOC protocol required patients who still had preserved bone marrow reserve to deplete those reserves and suffer from ascites, bleeding esophageal var[ic]es or hepatic encephalopathy before even being considered for the new treatment, heralded as a <u>CURE</u> to HCV."  He alleges that the delay in treatment "contravened the CDC's 2013 published statement that the standard of care in HCV treatment in the United States is treatment with DAA's for ALL hepatit[i]s C patients," not just those with "decompensated cirrhosis." (DE 1 at 6.)

Finally, in May 2016, Plaintiff developed physical symptoms "severe enough to warrant treatment under MDOC policy."  However, by that time, his condition "has deteriorated to such an extent that the overwhelming portion of potential benefit was completely lost."  (DE 1 at 7.)

### 2. Defendants QCCM and Hutchinson are entitled to summary judgment as to Plaintiff's claims against them.

Defendants QCCM and Hutchinson argue that they are entitled to summary judgment, because:  **(a)** "Hutchinson was not deliberately indifferent to Plaintiff's serious medical needs[;]" **(b)** QCCM "did not establish or promulgate a policy, practice or procedure that was deliberately indifferent to a substantial risk of serious harm to Plaintiff[;]" and, **(c)** "Plaintiff lacks corroborative medical

evidence demonstrating harm caused by an inappropriate delay in treatment."  (DE 33 at 14-17.)

### a.    Fed. R. Civ. P. 56

Defendants QCCM and Hutchinson seek relief under Fed. R. Civ. P. 56. (DE 33 at 12-13.)  Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the case under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  The Court "views the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the nonmoving party."  *Pure Tech Sys., Inc. v. Mt. Hawley Ins. Co.*, 95 F. App'x 132, 135 (6th Cir. 2004) (internal citations omitted).

"The moving party has the initial burden of proving that no genuine issue of material fact exists . . . ."  *Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 486 (6th Cir. 2011) (internal quotations omitted); cf. Fed. R. Civ. P. 56 (e)(2) (providing that if a party "fails to properly address another party's assertion of fact," then the court may "consider the fact undisputed for the purposes of the motion.").  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC*

*v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  The nonmoving

party must "make an affirmative showing with proper evidence in order to defeat

the motion." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009); *see also*

*Metro. Gov't of Nashville & Davidson Cnty.*, 432 F. App'x 435, 441 (6th Cir.

2011) ("The nonmovant must, however, do more than simply show that there is

some metaphysical doubt as to the material facts . . . .   [T]here must be evidence

upon which a reasonable jury could return a verdict in favor of the non-moving

party to create a genuine dispute.") (internal quotation marks and citations

omitted).

　　　Summary judgment is appropriate if the evidence favoring the nonmoving

party is merely colorable or is not significantly probative.  *City Management Corp.*

*v. United States Chem. Co.*, 43 F.3d 244, 254 (6th Cir. 1994).  In other words,

summary judgment is appropriate when "a motion for summary judgment is

properly made and supported and the nonmoving party fails to respond with a

showing sufficient to establish an essential element of its case. . . ." *Stansberry*,

651 F.3d at 486 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

　　　The fact that Plaintiff is *pro se* does not lessen her obligations under Rule

56.  Rather, "liberal treatment of *pro se* pleadings does not require lenient

treatment of substantive law." *Durante v. Fairlane Town Ctr.*, 201 F. App'x 338,

344 (6th Cir. 2006).  In addition, "[o]nce a case has progressed to the summary judgment stage, . . . 'the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable.'"  *Tucker v. Union of Needletrades, Indus. & Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (quoting *Gilmour v. Gates, McDonald & Co.,* 382 F.3d 1312, 1315 (11th Cir. 2004)).  The Sixth Circuit has made clear that, when opposing summary judgment, a party cannot rely on allegations or denials in unsworn filings and that a party's "status as a *pro se* litigant does not alter [this] duty on a summary judgment motion." *Viergutz v. Lucent Techs., Inc.*, 375 F. App'x 482, 485 (6th Cir. 2010); *see also United States v. Brown*, 7 F. App'x 353, 354 (6th Cir. 2001) (affirming grant of summary judgment against a *pro se* plaintiff because he "failed to present any evidence to defeat the government's motion").

> ### b.    Eighth Amendment deliberate indifference to a serious medical need

Plaintiff claims that "Defendants" were deliberately indifferent to his serious medical needs, which resulted in "substantial injury" in violation of the Eighth Amendment.  (DE 1 at 8; *see also* DE 9-11.)  "The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs . . . ." *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 539 (6th Cir. 2008).  "A constitutional claim for deliberate indifference to serious medical needs requires a showing of objective

and subjective components."  *Phillips*, 534 F.3d at 539; *see also Santiago v.*

*Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Comstock v. McCrary,* 273 F.3d

693, 702 (6th Cir.2001)).  As the Supreme Court has instructed in *Farmer v.*

*Brennan*, 511 U.S. 825 (1994):

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.  Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met.  *First*, the deprivation alleged must be, objectively, "sufficiently serious," . . . ; a prison official's act or omission must result in the denial of "the minimal civilized measure of life's necessities," . . . .  For a claim (like the one here) based on a failure to prevent harm, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm.  . . .
>
> The *second* requirement follows from the principle that "only the unnecessary and wanton infliction of pain implicates the Eighth Amendment." . . . To violate the Cruel and Unusual Punishments Clause, a prison official must have a "sufficiently culpable state of mind."  . . . In prison-conditions cases that state of mind is one of "deliberate indifference" to inmate health or safety, . . . a standard the parties agree governs the claim in this case.

*Farmer*, 511 U.S. at 834 (internal footnote and internal citations omitted).  The

Court then went on to set forth the test for deliberate indifference:

> . . . a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and *disregards* an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . But an official's failure to alleviate a significant risk that he *should have perceived but did not*, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Id*. at 837–838 (emphasis added).  "[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."  *Id.* at 839–840.

Plaintiff alleges that HCV is a serious medical need.  (DE 1 at 8.)  This Court has previously noted that "Hepatitis C can be a serious medical condition mandating treatment.  However, not all cases of hepatitis C require treatment." *Allen v. Shawney*, No. 11-10942, 2014 WL 1089618, at *11 (E.D. Mich. Mar. 18, 2014) (Ludington, J.), *aff'd* (June 3, 2015) (external footnote omitted).  Here, the Court assumes, for purposes of this motion only, that Plaintiff's cirrhosis of the liver / Hepatitis C Virus constitutes a serious medical need.  Thus, the specific issue before the Court is whether there is a "genuine dispute as to any material fact" regarding the second or subjective prong of an Eighth Amendment deliberate indifference claim, *i.e.*, that Defendant QCCM and/or Hutchinson were *deliberately indifferent* to Plaintiff's serious medical need.  (*See also* DE 38 at 5.)

### c.    Plaintiff's Eighth Amendment claim against Defendant Hutchinson

Plaintiff seems to allege that, during 2011, he was denied treatment with the "*treating physician* quoting the selective process of the MDOC protocol as the determining factor[,]" (DE 1 at 6 (emphasis added)), but it is not clear whether he

is referring to Defendant Hutchinson. More specifically, and presumably referring

to the events of June 2013 (when Defendant Hutchinson allegedly "again declined

to administer the then current standard of treatment") and April 2014 (when

Defendant Hutchinson allegedly "admitted that the MDOC had begun to utilize the

newly sanctioned direct acting anti-viral agents (DAA) to treat patients[,]"),

Plaintiff alleges that:

- Dr. Craig Hutchinson, MD of Quality Correctional Care of Michigan (QCCM) denied Plaintiff's treatment of his HCV infection with either conventional or the new direct acting anti-viral agent medication despite his comprehensive awareness that delay would detrimentally exacerbate the medical problem.

- In designing a Protocol which chooses a course of monitoring over treatment in accordance with medical standards, the MDOC *through Dr. Hutchinson* consciously disregarded the known risks of Plaintiff's serious medical needs, namely, disease progression into ascites, portal hypertension, hepatic encephalopathy and esophageal varices.

- Dr. Craig Hutchinson definitively cited the "MDOC Protocol" as his authority for failing to administer treatment to the Plaintiff in compliance with national standards for HCV infection.

(DE 1 at 6, 9-10 (emphasis added).)

The QCCM Defendants argue that Defendant Hutchinson "was not

deliberately indifferent to Plaintiff's serious medical needs." (DE 33 at 14-16.)

They do so by attaching and discussing medical records dated April 29, 2016

through December 5, 2016:

- Plaintiff saw Craig L. Hutchinson, M.D., on April 29, 2016. Among other things, Dr. Hutchinson reviewed Plaintiff's April 13, 2016 laboratory studies, recommended a liver ultrasound "every 6 months[,]" and noted that one was scheduled for May 3, 2016 at DWHC (Duane Waters Health Clinic).  Among other things, Dr. Hutchinson assessed HCV "infection genotype 1a[,]" and "stage 4 fibrosis."  (DE 35-1 at 1-3; *see also* DE 33-1 ¶ 7 [Hutchinson Affid.].)

- On May 31, 2016, Plaintiff began Harvoni® treatment.  (DE 33-1 ¶ 8 [Hutchinson Affid.]; *see also* DE 35-1 at 4-5.)

- On July 7, 2016, Plaintiff had a telemedicine consultation with Brendan Sherry, PA-C.  Among other things, Sherry noted the May 3, 2016 liver ultrasound findings.  He requested that Plaintiff be referred "for liver ultrasound as hepatocellular carcinoma surveillance again during November 2016 . . . [,]" and that Plaintiff repeat such study "every six months indefinitely."  Also, Sherry "scheduled lab again for [the following] week and a HCV RNA for [September 20, 2016]."  (DE 35-1 at 4-5.)

- Plaintiff finished Harvoni® treatment on August 22, 2016.  (DE 33-1 ¶ 8 [Hutchinson Affid.]; *see also* DE 35-1 at 4-5.)

- On December 5, 2016, Plaintiff had a telemedicine consultation with PA Sherry, who noted, among other things, that:  **(a)** "HCV cure was signaled by the negative HCV RNA on [November 23, 2016]," **(b)** Plaintiff "still has cirrhosis, which requires liver ultrasound every six months indefinitely[,]" and **(c)** "[t]he liver ultrasound dated [November 29, 2016] was reported as normal."  (DE 35-1 at 6; *see also* DE 33-1 ¶ 9 [Hutchinson Affid.].)

Moreover, Defendant Hutchinson attests that "[f]ollow-up testing in February 2017

confirmed the cure" of Plaintiff's Hepatitis C infection, and "Mr. Crawford's liver

ultrasound test results have continued to be normal." (DE 33-1 ¶¶ 9-10 [Hutchinson 12/23/2017 Affid. (emphasis in original)].)

Defendants QCCM and Hutchinson correctly point out that Plaintiff "is dissatisfied with the timing of the treatment provided[.]" (DE 33 at 15-16; DE 39 at 2.) Indeed, Plaintiff responds, in part, that "[t]he current standard of care for this disease at the time was a course of three medications[,] [which] Crawford . . . did not rec[ei]ve immediately, allegedly due to the selective process of MDOC protocol!" (DE 38 at 4.) He also contends that he "was not approved to rec[ei]ve [the] treatment by Dr. Hutchinson *until* May 2016[,]" even though it had been "approved" – presumably a reference to the MDOC beginning to use it - during 2014. (*Id.* (emphasis added); *see also* DE 1 at 6.) "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Additionally, while Plaintiff clearly *attempts* to bring a federal constitutional claim, his many references to the "standard of care" for HCV within his pleading (*see* DE 1 at 6-7, 9), suggest that he is conflating the Eighth Amendment deliberate indifference standard with that of a medical malpractice claim. *Hann v. Michigan*, No. 05-CV-71347-DT, 2010 WL 1006206, at *9 (E.D. Mich. Feb. 25, 2010) (Komives, M.J.) ("Indeed, the deficiency in Dr.

Shevitz's letter is evidenced by his conflating of the deliberate indifference standard with the standard of care, an element in a medical malpractice claim."), *report and recommendation adopted*, No. CIV.A. 05-CV-71347, 2010 WL 1002611 (E.D. Mich. Mar. 16, 2010).  Plaintiff's claims against Defendant Hutchinson do not meet the standard necessary to survive summary judgment on a deliberate indifference claim.

### d.   Plaintiff's Eighth Amendment claim against Defendant QCCM

Plaintiff seems to name QCCM as Hutchinson's employer.  (DE 1 at 9.)  He then claims that QCCM was "contracted . . . to provide medical services to the MDOC[,]" and "is directly responsible for refusing to provide necessary treatment in violation of the 8th Amendment."  (DE 1 at 10.)

Defendant QCCM is entitled to summary judgment as to Plaintiff's claims against it.  First, to the extent Plaintiff names QCCM solely as Hutchinson's employer, "*[r]espondeat superior* or vicarious liability will not attach under § 1983."  *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-695 (1978)).  *See also Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) ("PHS cannot be held responsible for the acts of its employees under a theory of respondeat superior or vicarious liability.").

14

Second, QCCM does not appear to have established or promulgated "a policy, practice or procedure that was deliberately indifferent to a substantial risk of serious harm to Plaintiff." (DE 33 at 16-17.)  As Defendant Hutchinson attests,

- The HCV treatment program is implemented by the MDOC and follows the latest national treatment guidelines.  The drugs required for the HCV treatment are paid for by the State of Michigan, not Corizon.[5]  Accordingly, the number of inmates who can receive treatment at any one time is controlled by the MDOC and is commensurate with the numbers of individuals requiring treatment under the standards of the program.

- Under the MDOC program, inmates who have been identified as having HCV are monitored and prioritized for consideration for treatment.  Those inmates who need the treatment most immediately are provided access to treatment first.

(DE 33-1 ¶¶ 5-6; *see also* DE 33 at 17.)  This is supported by Plaintiff's complaint, which makes multiple references to "MDOC protocol," "MDOC policy," and "policy, procedure and protocol."  (DE 1 at 6-11.)  Even the references to "policy, procedure and protocol" appear limited to the MDOC or to Washington as the "decision maker" or "policymaker[]."  (DE 1 at 10-11.)  Moreover, Plaintiff's response expressly states that "[t]he HCV treatment program is implemented by the MDOC . . . [,]" and "the number of inmates who can rec[ei]ve treatment at any one time is controlled by the MDOC . . . ."  (DE 38 at 2-3.)

True, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to

---

[5] QCCM is a subsidiary of Corizon.  (*See* DE 33 at 10, DE 33-1 ¶ 2.)

represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694; *see also Heyerman v. Cty. of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012) ("Municipal liability only attaches where a custom, policy, or practice attributable to the municipality was the 'moving force' behind the violation of the plaintiff's constitutional rights.") (citing *Miller v. Sanilac Cnty.,* 606 F.3d 240, 254–55 (6th Cir. 2010)); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) ("municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."). However, Defendants MDOC and Washington were terminated as Defendants on February 7, 2018, when the Court dismissed them from this lawsuit. (DE 37.) "[T]o satisfy the Monell requirements a plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (internal quotation omitted). With his focus on MDOC policy, Plaintiff has not done so as to Defendant QCCM. (*See* DE 33 at 16-17; DE 39 at 2-3.) Furthermore, Defendant Hutchinson – apparently an employee of QCCM and presumably so at the time relevant to this complaint – attests that, at the time of the April 29, 2016 telemedicine consultation, he "had been monitoring Mr.

Crawford's condition for several years[,]" and further attests that Plaintiff began

Harvoni treatment on May 31, 2016.  (*See* DE 33-1 ¶¶ 2-3, 7-8.)  In addition, while

the only medical documents on record seem to be those dated 2016 (*see* DE 33-2,

DE 35), even Plaintiff's verified complaint admits to having been placed on "a

regimen of monitoring" and mentions a decision by Hutchinson in June 2013 (DE

1 at 6, 7).  Thus, despite any disagreement with the manner in which he was

treated, Plaintiff, himself, effectively admits that he has been monitored by QCCM

over a course of years.

### e.    Delay in treatment

Plaintiff's multiple references to "delay" show that, in essence, he is

challenging the timing of his treatment.  (DE 1 at 6, 9.)  He alleges that "the

MDOC medical provider" knew of his HCV infection in 2005 but "withheld" such

information, although the complaint is not clear whether this reference is to

Defendant QCCM or Defendant Hutchinson.  (DE 1 at 6.)  More specifically, the

facts underlying Plaintiff's complaint concern the period from 2010 (when he

claims to have learned of his diagnosis and at which time "the progression of the

disease was undetermined"), through 2011 (when he received two tests, the latter

of which showed "Stage 4," cirrhosis), through May 2016 (when he had allegedly

developed "physical symptoms severe enough to warrant treatment under MDOC

policy.").  (DE 1 at 6-7.)  He claims this has resulted in loss of treatment benefit, as well as physical and mental symptoms.  (DE 1 at 7.)  As phrased by Plaintiff:

> The fact that Defendants eventually determined that Plaintiff's degeneration had finally progressed to such a critical state as to warrant treatment under MDOC Protocol does not in any way indemnify them from liability for the catastrop[h]ic damage sustained in the interim.

(DE 1 at 9.)  He claims the "years-long delay in treatment . . due to MDOC Protocol has resulted in irreversible damage to his liver, chronic fatigue, sustained abdominal pain and severe depression . . . ."  (DE 1 at 9-10.)  In his response, Plaintiff again mentions delay (DE 38 at 4), elaborates on the risk of not knowing his diagnosis during 2005 through 2010, and notes the 2011 "misdiagnoses" and "very high risk of harm" (DE 38 at 6-7 ¶¶ 12-14).

Defendants QCCM and Hutchinson contend that Plaintiff "lacks corroborative medical evidence demonstrating harm caused by an inappropriate delay in treatment."  (DE 33 at 17; *see also* DE 39 at 3.)  "'An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed.'"  *Napier v. Madison Cty., Ky.*, 238 F.3d 739, 742 (6th Cir. 2001) (quoting *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1188 (11th Cir. 1994) (*overruled on other grounds by Hope v. Pelzer*, 536 U.S. 730, 739 (2002))).  However, the requirement to place verifying medical

18

evidence in the record "does not apply to medical care claims where facts show an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 898 (6th Cir. 2004).

However, even if Plaintiff's allegations regarding treatment of his HCV and/or cirrhosis necessitate "medical proof . . . to assess whether the delay caused a serious medical injury[,]" *Blackmore*, 390 F.3d at 898 (citing *Napier,* 238 F.3d at 742), and even if he has failed to provide such evidence, the salient point here is that Defendants *QCCM and Hutchinson* are entitled to summary judgment as to Plaintiff's claim that they were *deliberately indifferent* to his cirrhosis / HCV during 2005 through May 2016 by "delayed treatment." This is so, because Hutchinson has attested that "the number of inmates who can receive treatment at any one time is *controlled by the MDOC* and is commensurate with the numbers of individuals requiring treatment under the standards of the program[,]" and that "inmates who have been identified as having HCV are monitored and prioritized for consideration for treatment." (DE 33-1 ¶¶ 5-6 (emphasis added).) Thus, Defendants QCCM and Hutchinson have explained that "the date of diagnosis does not determine when an MDOC prisoner receives treatment for HCV[,]" (DE 39 at 1), *nor do they appear to be in control of when treatment is implemented*. On the record before it, the Court has no reason to doubt Defendants QCCM and

Hutchinson's contention that, "regardless of whether Mr[.] Crawford's diagnosis was in 2005 or 2010, he was monitored until he was one of the highest priority prisoners for treatment – at which time his medical need became sufficiently serious to require treatment – and at which time it is undisputed that he received Harvoni treatment, which cured his HCV infection." (DE 39 at 2.) In sum, the Court should conclude that "there is no genuine dispute as to any material fact" regarding the subjective element of a delay-based claim against Defendants QCCM or Hutchinson.

### 3.     Discovery and Fed. R. Civ. P. 56(d)

To be sure, within his response to the pending dispositive motion, Plaintiff seeks "medical reports from 2005 [through] 2011 . . . [,]" alleging that there is "no proof that Crawford had Stage 2 in 2011 and not in 2005 and had become infected with Stage 4 [HCV] before 2010 . . . ." (DE 38 at 3.) Plaintiff mentions "possibly more defendants" and "[a] needed discovery of documents and investigation need during this time period[.]" (DE 38 at 7 ¶ 13.) In the end, he requests that the Court grant his "motion for discovery." (DE 38 at 9.)

Plaintiff's request should be denied for several reasons, notwithstanding the pending dispositive motion. First, Plaintiff's case citations suggest that the materials he seeks "are objects of outstanding discovery," and that he "has not had an opportunity to pursue discovery . . . [,]" or his discovery requests "have not

been answered[,]" or he "has been unable to obtain responses to his discovery requests." (DE 38 at 8 ¶¶ 16-19.) However, Plaintiff has not demonstrated to the Court that he has served discovery requests in accordance with the Federal Rules of Civil Procedure, such as Rule 33 and Rule 34. *See also* E.D. Mich. LR 37.2 ("Form of Discovery Motions").

Second, even in the presence of Plaintiff's "discovery" statements, Plaintiff has not properly asserted that facts are unavailable to him. "If a nonmovant shows *by affidavit or declaration that, for specified reasons*, it cannot present facts essential to justify its opposition, the court *may*: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d) (emphases added). Plaintiff's February 6, 2018 response is not verified or signed under penalty of perjury. (DE 38 at 9.) Thus, he has not invoked the procedure set forth in Fed. R. Civ. P. 56(d). Even if he had, the Court's options are discretionary, not mandatory.[6]

Third, to the extent Plaintiff's complaint is based upon the events of 2005 through April 2016, he was free to request related medical records in accordance with the MDOC Policy Directive governing "Prisoner Health Information," which

---

[6] In fact, this rule was discussed and/or cited in both the Court's prior report and recommendation and the opinion and order adopting it. (DE 25 at 24-25, DE 37 at 4.)

contains several provisions concerning "Prisoner Access to Health Records."

MDOC PD 03.04.108 (effective Sept. 14, 2015), ¶¶ T-V.  For example:

> A prisoner may receive copies of documents generated by the Department and contained within his/her health record by making a specific, written request to the appropriate health information manager or designee and paying the required per-page fee, as set forth in OP 03.04.108B "Prisoner Access to Medical Records."  Legal questions shall be referred to OLA.

*Id.* ¶ U.  Defendants QCCM and Hutchinson contend that they "only obtained Mr.

Crawford's MDOC medical records for the time frame of January 1, 2016 through

September 14, 2017, because those were the records necessary to demonstrate what

Mr. Crawford's condition was in 2016 and what treatment he received at that

time[,]" and point Plaintiff to MDOC PD 03.04.108 for copies of records older

than those filed with the Court on December 29, 2017 (DE 35), explaining that

"Corizon Defendants do not have them."  (DE 39 at 3-4.)[7]

Or, to the extent Plaintiff's complaint is based upon the time period

beginning with his April 29, 2016 visit with Hutchinson and continuing through

May 2016 (which appears to be the latest date in his complaint), Plaintiff does not

specify why he cannot adequately respond to Defendants QCCM and Hutchinson's

---

[7] The Court has no reason to doubt the representation about possession of *MDOC medical records*.  The related MDOC Policy Directive provides that "[c]opies of pertinent portions of the prisoner health record may be provided to non-Department health care facilities or providers treating the prisoner[,]" but also that "[t]he complete, original prisoner health record *shall be retained by the Department* as indicated above."  *Id.* ¶ K (emphasis added).

argument (DE 33 at 14-17), with its attached affidavit from Hutchinson (DE 33-1), and the provided medical records which span the period of April 29, 2016 through December 5, 2016 (DE 35-1).[8]

### C.   Defendant MCC

Plaintiff clearly lists the "Michigan Corrections Commission, et al" as a defendant(s).  (DE 1 at 2.)[9]  By way of background, the MCC is discussed in Mich. Comp. Laws §§ 791.201, *et seq*.  Among other things, these statutes explain that "[t]he commission *shall constitute the responsible authority for the administration of the correctional facilities, correctional industries, parole, and probation of the state, subject to the limitations set forth in this act*."  Mich. Comp. Laws Ann. § 791.202 (emphasis added).  In addition,

> *The commission shall appoint a director of corrections who shall be qualified by training and experience in penology*. He shall hold office at the pleasure of the commission except that he may be removed for

---

[8] In their reply, Defendants QCCM and Hutchinson suggest that these documents are the result of a request for records from January 1, 2016 through September 14, 2017.  (DE 39 at 3.)

[9] Incidentally, Plaintiff follows his description of the three "non-individual defendants" – MDOC, QCCM and the MCC – with "et al."  (DE 1 at 2.)  Even though Plaintiff's later-filed response alludes to "possibly more defendants," (DE 38 at 7 ¶ 13), it is not clear *within the complaint* who these other "defendants" may be (*see*, *e.g.*, DE 1 at 8-9, 12), and he does not name any John Doe Defendants (DE 1 at 1-2).  Even if he had, they could not remain standing alone after all other Defendants have been dismissed.  *See Word v. City of Detroit, et al.*, Case No. 2:16-cv-11423-LJM-APP (E.D. Mich. Dec. 4. 2017) ("This case cannot proceed until there is an active defendant.") (*report and recommendation of* Patti, M.J.), *accepted by* Michelson, J. (E.D. Mich. Jan. 3, 2018).

cause and only after a public hearing before the commission. He shall receive such salary as shall be appropriated by the legislature, together with actual and necessary traveling and other expenses. The director shall be the chief administrative officer of the commission and shall be responsible to the commission for the exercise of the powers and duties prescribed and conferred by this act, and for such other powers and duties as may be assigned by the commission, subject at all times to its control. Subject to the provisions of this act, and to the rules and regulations adopted by the commission, the director *shall have full power and authority to supervise and control the affairs of the department*, and the several bureaus thereof, and he shall carry out the orders of the commission.

Mich. Comp. Laws Ann. § 791.203 (emphases added).

Although Plaintiff's "Statement of Claims" mentions the "Michigan Corrections Commission," and seems to interchangeably reference "Committee," Plaintiff's cause of action against this particular entity is unclear, as he simply alludes to or cites the above-italicized portions of Sections 791.202 and 791.203 and states that the Committee "as a practice, do[es] not engage in significant oversight." (DE 1 at 10.) Thus, the Court may consider dismissal of this Defendant on the basis that Plaintiff has failed "to state a claim" against it "upon which relief may be granted[.]" 28 U.S.C.A. § 1915A(b)(1).[10] *See also* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief[.]") Plaintiff's claims against the yet to be served

---

[10] *See also* 28 U.S.C. § 1915A(a) ("Screening.") ("The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.") (emphasis added).

Defendant MCC are unknown, and, thus, do not satisfy either the aforementioned

screening or pleading rules.  As such, the claims against Defendant MCC should

likewise be dismissed.[11]

**D.    Conclusion**

A portion of Plaintiff's February 2018 response seeks to reinstate his

November 2017 motion for appointment of counsel (DE 28), at least in part "to

help amend his complaint where as to change suit of defendants from their official

cap[a]city to a[] status of suit in their individual cap[a]city."  (DE 38 at 7 ¶ 15; *see*

*also* DE 38 at 1, 7 ¶ 13, 9.)  However, on April 11, 2018, the Court entered an

order denying without prejudice Plaintiff's November 16, 2017 motion for

appointment of counsel, which specifically provided that "Plaintiff may petition

the Court for the recruitment of *pro bono* counsel if this case survives dispositive

motion practice, proceeds to trial, or if other circumstances demonstrate such a

---

[11] Moreover, it is doubtful that the MCC is an entity amenable to suit.  *See*, *e.g.*,
*Sims v. Michigan Dep't of Corr.*, 23 F. App'x 214, 215 (6th Cir. 2001) ("Because
the MDOC is a *state agency* and the state of Michigan has not consented to civil
rights suits in the federal courts, the MDOC is entitled to Eleventh Amendment
immunity.") (emphasis added); *Barajas v. Waters*, 815 F. Supp. 222, 224 n.1 (E.D.
Mich. 1993) (Zatkoff, J.) (noting that Defendant Waters – an MCC *member* – "was
never properly served and was dismissed from th[e] suit pursuant to Fed.R.Civ.P.
4(j) . . . ."), *aff'd sub nom. Barajas v. Michigan Dep't of Corr.*, 21 F.3d 427 (6th
Cir. 1994).  In addition, the U.S. Marshal Service's June 28, 2017 attempt at
service upon Defendant MCC at MDOC Headquarters (P.O. Box 30003, Lansing,
MI 48909) was returned unexecuted, as "[n]o one at th[e] address [wa]s authorized
to accept service for this defendant[,]" (DEs 11, 14.),   Thus, it does not appear that
service upon Defendant MCC has been effected.

need in the future." (DE 44 at 5-6). At this point, it behooves the Court to address the instant motion before considering whether recruitment of counsel is necessary.

In sum, Defendants QCCM and Hutchinson are entitled to summary judgment as to Plaintiff's claims against them. As such, the Court should grant their dispositive motion and dismiss Plaintiff's claims against these Defendants. Moreover, the Court should dismiss Plaintiff's claims against Defendant MCC, pursuant to 28 U.S.C.A. § 1915A(b)(1).

## III.   PROCEDURE ON OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Fed. R. Civ. P. 72(b)(2) and E.D. Mich. LR 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1273 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," and "Objection No. 2," *etc.* Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," *etc.* If the Court determines that any objections are without merit, it may rule without awaiting the response.

Dated: June 11, 2018                    s/Anthony P. Patti
                                        Anthony P. Patti
                                        UNITED STATES MAGISTRATE JUDGE

### Certificate of Service

I hereby certify that a copy of the foregoing document was sent to parties of record on June 11, 2018, electronically and/or by U.S. Mail.

                                        s/Michael Williams
                                        Case Manager for the
                                        Honorable Anthony P. Patti